# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3472

_____

| | | |
|---|---|---|
| Mac Arthur Kammueller, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| | * | |
| Loomis, Fargo & Co., | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted : June 14, 2004
Filed : August 25, 2004

_____

Before MURPHY, BRIGHT, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff-Appellant, Mac Kammueller, appeals from a Motion for Summary Judgment granted in favor of Defendant-Appellee, Loomis, Fargo & Co. ("Loomis"), on his reasonable accomodation and disability discrimination claims under the Minnesota Human Rights Act ("MHRA").[1] Kammueller, who worked for Loomis for thirty-one years until his discharge in 2002, has polycystic kidney disease ("PKD"). Kammueller's PKD caused renal failure in 1995 and forced him to submit

_____

[1]Kammueller did not raise any federal claims. Loomis is a Texas corporation, headquartered in Texas, with local management in St. Paul, Minnesota.

to three-and-a-half hours of dialysis three days each week. We find that, as a matter of law, Kammueller is disabled under the MHRA. Additionally, we hold that there is a genuine issue of material fact as to whether Kammueller was qualified to perform the essential functions of his job with a reasonable accommodation and whether his termination was because of his disability. Accordingly, we reverse.

## I. Facts

Kammueller was born with PKD. It is a permanent physical impairment, which, since his kidneys failed in 1995, requires dialysis three afternoons per week for three-and-a-half hours. He necessarily spends additional recovery time in the hospital following treatment as well as time to travel to and from the hospital prior to and following treatment. His dialysis schedule is determined by the availability of the machine and is inflexible. The rigorous treatment prevents him from working during and following dialysis. The treatment renders him exhausted and unable to return immediately to work after it is completed. After dialysis he goes to sleep. Kammueller has a shunt in his right arm which, in combination with his kidney disorder, prevents him from lifting over forty pounds. He requires at least thirteen different medications and is unable to miss a dialysis appointment, at risk of death. He may consume limited kinds of food and beverages and only twelve ounces of liquids per day.

Loomis is a company that maintains a fleet of armored trucks that regularly services banks and financial institutions. Prior to 2000, Loomis employed "driver/guards" to drive armored trucks and serve as guards. Loomis also employed "custodians" to ride in the back of the armored trucks with the cargo and take and retrieve cargo from customers. The record is unclear regarding the extent to which Loomis maintained a strict division of labor between the custodians and the driver/guards. In 2000, however, Loomis formally consolidated the functions of these two positions and began to refer to the one resultant position as an Armored Service

Technician ("AST"). Accordingly, after 2000, the tasks of the ASTs included driving the armored trucks, picking up and delivering cargo, guarding other ASTs during loading and unloading, recording information about the cargo, and lifting and carrying up to fifty pounds.

Kammueller began work for Loomis in 1968 as a driver/guard. He also held a supervisory position from 1970-1973. The record does not reflect the extent to which Kammueller did or did not perform the full spectrum of duties as a driver/guard and/or custodian prior to 1986. He left Loomis from 1986 until 1988 in an attempt to earn more money as an over-the-road driver. In 1988, he resumed employment with Loomis as a driver/guard. Between 1988 and 1995, except on one isolated occasion, Kammueller did not perform any lifting duties; he only drove. Kammueller does not allege that medical limitations prior to 1995 prevented him from performing the full range of driver/guard and/or custodian duties, nor does he allege that his limited duties were due to an accomodation.

Beginning in 1995, after Kammueller's kidneys failed and after he started on dialysis, his job description changed to match his limited duties – driving only. With his altered job description, from 1995 to 2001, Loomis did not require Kammueller to lift over forty pounds. In addition, the local general manager in Minnesota, Tim Maurer, assigned Kammueller to the three o'clock until eleven o'clock a.m. shift to accommodate the dialysis schedule. This altered schedule was also a benefit to Loomis because the early morning shift was unpopular and difficult to fill. Further, the early morning shift was in place at the request of a customer, MTC, not merely as an accommodation for Kammueller. Kammueller performed his job satisfactorily for at least the six years from 1995 to 2001.

In September 2001, Loomis lost the business of an important client, Wells Fargo. Wells Fargo accounted for a significant portion of Loomis's business. The loss required a substantial reduction in force. The staff reduction affected fifty

employees, about half of Loomis's workers, through termination or attrition. Corporate management in Texas directed the local management in Minnesota to terminate employees in order of reverse seniority and require all ASTs to perform all of functions of the position. Curt Deaver, the local operations manager in Minnesota, and Chuck Hedlund, the local human resources manager in Minnesota, advised Kammueller of this change. Kammueller had the seniority to survive layoffs that occurred following the loss of Wells Fargo's business but could not meet the fifty pound lifting requirement for the AST position. Kammueller informed them that he could not lift more than forty pounds and requested continued accommodation. At the time, Loomis considered the possibility of retaining Kammueller. Mauer and Deaver agreed that Loomis could continue to accommodate and employ Kammueller after the reduction in force. They modified his position; he drove for four hours, from three o'clock to seven o'clock a.m., and he worked on paperwork in the vault from seven o'clock to eleven o'clock a.m. Kammueller remained in this modified position for several months after the loss of the Wells Fargo account.

The record has conflicting testimony as to whether there was adequate driving and vault work to occupy Kammueller's time in his modified position. There is no clear indication of what then led to Loomis's subsequent decision to revisit the issue of an accommodation for Kammueller and enforce the lifting requirement against Kammueller. However, the local managers apparently renewed discussions with corporate managers in Texas regarding their inability to conceive of a solution to the application of the lifting requirement to Kammueller. Human resources managers at the corporate level in Texas authorized the elimination of Kammueller's modified position and gave permission for his termination. In a termination letter to Kammueller, Hedlund cited Kammueller's inability to meet the minimum lifting requirement as the reason for termination. In this litigation, but not in the termination letter, Loomis also cites scheduling inflexibility as an additional ground for termination.

The record does show, however, that operations manager Deaver was dissatisfied with the decision to terminate Kammueller because a driver for the early route was necessary, the position was difficult to fill, and Deaver thought there was adequate vault work to occupy Kammueller's remaining hours. At his deposition, Deaver testified that he continues to believe Kammueller's disability could be accommodated.

## II. Standard of Review

We review the grant of the motion for summary judgment de novo and we view the facts in a light most favorable to the non-moving party. Equal Employment Opportunity Comm'n v. Liberal R-II Sch. Dist., 314 F.3d 920, 922 (8th Cir. 2002). We affirm only if there is a genuine issue of material fact or if no material factual dispute exists and the moving party is entitled to judgment as a matter of law. Mayer v. Nextel W. Corp., 318 F.3d 803, 806 (8th Cir. 2003); Fed. R. Civ. Pro. 56(c). At summary judgment, because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses. Quick v. Donaldson Co., 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## III. Discussion

Kammueller raised claims under the MHRA for failure to accommodate and disability discrimination. Kammueller may use direct or circumstantial evidence to prove his claims. Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001). Using circumstantial evidence to establish his prima facie case, which is a requirement under both claims, Kammueller must present evidence sufficient to permit a reasonable jury to conclude that he was (1) disabled within the meaning of the MHRA, (2) qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) suffered an adverse employment action because of his disability. Liljedahl v. Ryder Student Transp. Services, Inc., 341

F.3d 836, 841 (8th Cir. 2003). Under the failure to accommodate claim, Kammueller must also show that his employer knew of, and failed to reasonably accommodate, his disability. Minn. Stat. § 363A.08 subd. 6. Under the claim of disability discrimination, we apply the McDonald Douglas burden shifting analysis. Hoover, 632 N.W.2d at 542. We address these claims in turn below.

## A. Failure to Accommodate
### i. Disabled Under MHRA

The MHRA provides, in relevant part, that an individual is disabled if he or she has a "physical, sensory, or mental impairment which materially limits one or more major life activities." Minn. Stat. § 363A.03 subd. 12 (2003). The MHRA "materially limits" standard is less stringent than the Americans with Disabilities Act ("ADA") "substantially limits" standard. Liljedahl, 341 F.3d at 841 n.3. Otherwise, we analyze cases under the ADA and MHRA with the same standard. Philip v. Ford Motor Co., 328 F.3d 1020, 1023 n.3 (8th Cir. 2003); Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 711 n.5 (8th Cir. 2003). The Rehabilitation Act, 29 U.S.C. § 701, et seq., is also a source of guidance for interpretion of these statutes. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 193 (2002); 42 U.S.C. § 12117(b) (provisions of the ADA must be interpreted in a manner that "prevents imposition of inconsistent or conflicting standards for the same requirements under [the ADA] and the Rehabilitation Act of 1973."); Johnson v. U.S. Steel Corp., 943 F.Supp. 1108, 1114 n.2 (D. Minn. 1996) (cases interpreting the Rehabilitation Act are relevant to cases interpreting the ADA).

The ability to care for oneself is a major life activity under the MHRA. Ordahl v. Forward Tech. Indus., Inc., 301 F. Supp. 2d 1022, 1027-28 (D. Minn. 2004). A person is substantially limited if he has a long term or permanent "impairment that *prevents or severely restricts the individual* from doing activities that are of central importance to most people's daily lives." Fenney, 327 F.3d at 714 (quoting Toyota

534 U.S. at 198).[2] In <u>Fenney</u>, the plaintiff lost a thumb and half of his middle finger on his dominant hand and irreparably damaged his right arm. According to his physician, because of this impairment,

> Mr. Fenney requires more time during the winter to do changes [sic] in regards to his clothing. The lack of his right thumb makes it difficult for him to do certain types of grasping motions which would delay him in terms of being able to change his clothes in cold weather.

<u>Id.</u> at 715-16. Fenney requires "twice as long as an average person to perform his 'taking care of himself' tasks - bathing, shaving, preparing a meal, dressing, and going to the restroom," and needs an extra thirty minutes to arrive to work. <u>Id.</u> at 716. The Eighth Circuit held that Fenney's extra thirty minutes to prepare himself for work in the morning could create a genuine issue of material fact as to whether he was substantially limited in caring for himself. <u>Id.</u>

Here, Kammueller's kidney failure demands that he spend ten and a half hours per week in dialysis and four to five additional hours in the hospital and travel time to and from the hospital. He goes straight to sleep following dialysis and is not able to work during that time. In addition, he is prescribed over thirteen different medications and has severe dietary and fluid intake restrictions. Together, these restrictions render Kammueller incapable of doing activities of central importance to a person's life, such as cleansing one's own blood cells. There is no factual dispute as to the existence of Kammueller's limitations. Kammueller demonstrates greater restrictions than those present in <u>Fenney</u>, an ADA case under the more stringent "substantially limits" standard. The severity of Kammueller's restrictions viewed

---

[2]Following Eighth Circuit and Supreme Court precedent, we use this test for "substantial limitation" rather than the "condition, manner, or duration" test of the Equal Employment Opportunity Commission (EEOC) as suggested in Appellant's brief. <u>Toyota</u>, 534 U.S. at 194-203; <u>Fenney</u>, 327 F.3d at 714.

under the less stringent "material limits" standard of the MHRA, clearly demonstrate a disability.

Further, although not binding, ADA and Rehabilitation Act rulings on this issue from other courts suggest that PKD is, in fact, disabling. The Second Circuit stated, "We are inclined to view persons whose kidneys would cease to function without mechanical assistance or whose kidneys do not function sufficiently to rid their bodies of waste matter without regular dialysis, as being substantially limited in their ability to care for themselves." Gilbert v. Frank, 949 F.2d 637, 641 (2d Cir. 1991). The Southern District of New York found it "inconceivable that persons who suffer from chronic conditions involving organ failure, like . . . kidney failure, are not 'substantially limited' in certain major life activities, simply because they can lead relatively normal lives by . . . hooking themselves up to dialysis machines." Saks v. Franklin Covey Co., 117 F. Supp. 2d 318, 325 (S.D.N.Y. 2000). Similarly, in the District of Massachusetts, end stage renal failure from PKD requiring dialysis three times per week, "clearly qualif[ies] as [a] disabilit[y]." McDonald v. Menino, No. 96-10825, 1997 WL 106955, *1-2 (D. Mass. 1997). Because the MHRA uses a more lenient "materially limits" standard than the ADA's and Rehabilitation Act's "substantially limits" standard, we find as a matter of law that Minnesota's courts would adopt the position of the courts cited above. Accordingly, we find as a matter of law that end stage renal failure due to PKD is disabling.

Finally, if PKD were not in and of itself disabling, the severity of treatment, such as the dialysis in this case, renders the condition disabling under the MHRA. The Seventh Circuit held,

> [I]f a medical condition that is not itself disabling nevertheless requires, in the prudent judgment of the medical profession, treatment that is disabling, then the individual has a disability within the meaning of the Act, even though the disability is, as it were, at one remove [sic] from

the condition. We cannot find a case on the question, but the answer seems obvious--maybe that's why there are no cases.

Christian v. St. Anthony Med. Ctr., Inc., 117 F.3d 1051, 1052 (7th Cir. 1997); see also Gordon v. E.L. Hamm & Assoc., Inc., 100 F.3d 907, 912 (11th Cir. 1996) (noting that chemotherapy treatment for a cancer not itself shown to be disabling could be disabling within the meaning of the ADA). We think it is clear that the nature and severity of Kammueller's PKD therapy also renders him disabled under the MHRA.

Loomis does not dispute the facts of Kammueller's physical impairment or treatments. Loomis disputes only the conclusions to be drawn from Kammueller's impairment and treatments. Under the first element of the prima facie case, the showing of disability, we find as a matter of law that Kammueller satisfied this first element of his prima facie case.

ii. Essential Functions with Reasonable Accommodation

To make a prima facie showing that he is qualified for the job, Kammueller must demonstrate that he meets the essential prerequisites for the job, such as basic education, experience and training, and that he can perform the essential functions of the job with or without a reasonable accommodation. Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir. 2000). If he requires an accommodation, he must make a facial showing that an accommodation is possible, and, with it, he can perform the essential functions of the job. Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003). Essential functions of the job are "fundamental job duties," and the employer's judgment in this regard is considered "highly probative." Alexander v. The Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003). Evidence to consider in this determination may include: "(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the

incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." Heaser v. The Toro Co., 247 F.3d 826, 831 (8th Cir. 2001).

Eighth Circuit cases generally give deference to the employer's judgment of essential job functions, especially when staffing is problematic. See Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 787 (8th Cir. 1998) (stating that limited staffing and budget for staffing should be considered in evaluating the consequences of not requiring the incumbent to perform the job functions and citing EEOC regulations to the same effect). The employer's judgment, however, although highly probative, is merely evidence and is not conclusive. Rather, we also emphasize the results upon the employer's business of eliminating that job function; "the consequence of not requiring [plaintiff] to perform these functions demonstrates that they are, indeed, essential." Dropinski v Douglas Cty., 298 F.3d 704, 709 (8th Cir. 2002) (summary judgment is appropriate if plaintiff cannot perform "many" of the eighteen written job requirements and can lift less than half of the minimum lifting requirement).

In the present case, viewing the facts in the light most favorable to the non-moving party, there is a material question of fact as to whether the consequences of allowing Mr. Kammueller to continue his morning shift in the vault and lift less than forty pounds are severe enough to consider this duty "essential." Prior to the restructuring, the consequences of the lifting limitation were not problematic. In fact, Loomis actually benefitted from his willingness to work the night shift, which was notoriously difficult to fill. Following the restructuring, Loomis capably accommodated Kammueller's lifting restriction and dialysis schedule. What exactly happened following the restructuring that caused local managers in Minnesota to revisit the issue of accommodation and renew discussions with corporate managers in Texas is unclear. The provision, and subsequent elimination, of Kammueller's accommodation after the reduction in force, at a minimum, creates a jury question as to whether the consequences of excusing Kammueller from certain job functions were

sufficiently severe to consider those job functions essential. Were we to give conclusive weight to the employer's opinion on this issue, Loomis, and in fact, any employer, would escape ADA and MHRA liability simply by defining job duties in a manner that excludes disabled employees.

Further, even assuming that lifting fifty pounds is an essential function of the job, the jury must still decide whether there is a reasonable accommodation available that would enable Kammueller to perform the job. Burchett, 340 F.3d at 517. Reasonable accommodations under the MHRA may include, "(a) making facilities readily accessible to and usable by disabled persons; and (b) job restructuring, modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices and the provision of aides on a temporary or periodic basis." Minn. Stat. § 363A.08 subd. 6 (2003). An employer, however, is not required to make such an accommodation when it will result in an "undue hardship." Id. Prior to and for several months following restructuring, Kammueller did perform all essential functions of his job with accommodations for his schedule and lifting limitation. He drove an early morning shift, and after restructuring also did paperwork and worked in the vault where he used a cart to transport coins. The early morning shift still exists, as do at least some vault duties and paperwork. Returning Kammueller to this position, which he successfully held for six years, including several months after the loss of the Wells Fargo business, is a potentially reasonable accommodation. Accordingly, a material question of fact remains as to whether a reasonable accommodation exists.

In its defense, Loomis contends that accommodating Kammueller would be unduly burdensome. Loomis "is under no obligation to reallocate the essential functions of a position that a qualified individual must perform." Moritz, 147 F.3d at 788. However, the statute plainly states that modification of hours and job restructuring may be reasonable accommodations. Minn. Stat. § 363A.08 subd. 6 (2003). Further, other than nonspecific references to "reallocation of essential

-11-

functions," Loomis has not offered any evidence to demonstrate that an accommodation would be burdensome. Rather, evidence shows that the operations manager, Curt Deaver, testified that there was adequate work for Kammueller following restructuring, that he is capable of performing it, and in fact was fulfilling the duties of the job, and that it could be beneficial to the company to keep him on the unpopular morning shift. The credibility of this testimony and whether accommodations that were available once are still available in a changed economy are questions of fact to be resolved by the jury.

### iii. Adverse Employment Action

Kammueller must show that he suffered an adverse employment action because of his disability. Liljedahl, 341 F.3d at 841. "An adverse employment action is one that causes a material change in the terms or conditions of employment." Brown v. Lester E. Cox Med. Ctrs., 286 F.3d 1040, 1045 (8th Cir. 2002). Here, it is clear that Kammueller suffered an adverse employment action; he was fired despite his seniority. Under Fenney, it is not necessary to apply the McDonnell Douglas framework to the prima facie case for a reasonable accommodation claim. Fenney, 327 F.3d at 712. Rather, the plaintiff "at all times retains the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his disability." Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995) (citations omitted). Here, Kammueller satisfied his burden adequately to survive a motion for summary judgment.

## B. Disability Discrimination

In a disability discrimination claim, unlike a reasonable accommodation claim, we apply the McDonnell Douglas burden-shifting framework.[3] Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001). After the plaintiff establishes a prima facie case, the employer must then "rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134-35 (8th Cir. 1999) (en banc). The plaintiff must then demonstrate that the non-discriminatory reason is actually pretextual. Id.

Loomis offered a legitimate reason for the adverse action: that restructuring, due to the loss of a major client, required the elimination of employees other than those with flexible schedules who could meet all minimum lifting requirements. Kammueller, however, created a material question of fact as to whether that explanation is pretextual. First, he presented evidence of discriminatory comments and derogatory statements about his disability. Also, there is evidence that Kammueller's shift was not dependent on the business of Wells Fargo, i.e., Loomis instituted the night shift at the request of a customer other than Wells Fargo. Finally, Kammueller's retention for a period of months following the restructuring establishes a question of fact as to whether Loomis's articulated reason was pretext. Kammueller's showing is sufficient to survive summary judgment.

Accordingly, the judgment of the district court is reversed.

_____

---

[3]We will not address the issue of whether Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), alters the burden shifting analysis of McDonnell Douglas. For the purposes of this opinion it is not relevant.