# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-2202

_____

Terri Kallail

*Plaintiff - Appellant*

v.

Alliant Energy Corporate Services, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: January 12, 2012
Filed: September 4, 2012

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Terri Kallail sued her employer, Alliant Energy Corporate Services ("Alliant"), alleging disability discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Iowa Civil Rights Act ("ICRA"), Iowa

Code § 216 *et seq*. The district court[1] granted summary judgment in favor of Alliant and dismissed the complaint. Kallail appeals, and we affirm.

I.

Because we are reviewing a grant of summary judgment, we describe the facts in the light most favorable to Kallail. Kallail began working at Alliant in 1996 as a Customer Service Consultant in Alliant's customer service center in Cedar Rapids, Iowa. She was promoted three times, ultimately rising to the position of Resource Coordinator at the Distribution Dispatch Center ("DDC") in Cedar Rapids. Employees in the DDC monitor the distribution of electricity, gas, and steam throughout the service territory, schedule and route resources to respond to routine and emergency work, and handle outage and other emergency situations so as to restore service and maintain system integrity.

To provide coverage twenty-four hours per day, seven days a week, Alliant requires Resource Coordinators at the DDC to work a rotating schedule. Resource Coordinators work in teams of two on nine-week schedules that rotate between twelve-hour and eight-hour shifts, and day and night shifts. During the first week, the team assists with storm work or outages and fills in for other Resource Coordinators who are absent from work. The second week is for training; the team travels to different service areas to learn about the areas and meet the employees who work in them. In the remaining weeks, Resource Coordinators work shifts differing in length, time of day, and day of the week.

---

[1]The Honorable Jon Stuart Scoles, United States Magistrate Judge for the Northern District of Iowa, sitting by consent of the parties pursuant to 28 U.S.C. § 636(c).

Kallail has Type I diabetes and is dependent on insulin. To maintain acceptable blood sugar levels, Kallail must test her blood sugar six to eight times per day, and must carefully manage the timing, frequency, quantity, carbohydrate count, and quality of the food and drink that she consumes. Kallail also suffers from Peripheral Vascular Disease ("PVD"), which significantly limits circulation to her legs and feet. As a result of her PVD, it is difficult for Kallail to walk or do anything else that causes her to lose blood flow to her legs. By the fall of 2004, Kallail had increased difficulty managing her diabetes while working a rotating shift. The rotating shift was causing her to experience erratic changes in blood pressure and blood sugar, and it put her at a higher risk for diabetic complications and death.

In November 2004, Kallail contacted someone in the company's human resource department about a possible accommodation related to her diabetes. On November 17, 2004, Heidi Hofland, a Senior Human Resources Generalist for Alliant, requested that Kallail's physician complete a medical certification form and return it to the company. Kallail's physician, Dr. Melanie Stahlberg, completed and submitted the form, recommending that Kallail work only straight day shifts. At one point, Dr. Stahlberg spoke with Hofland and told her that a rotating shift "caused erratic changes in [Kallail's] blood pressure and blood sugar and caused her to be at a higher risk for diabetic complications and overall mortality."

On April 12, 2005, Alliant, in a letter from Jill Breitbach, Senior Human Resources Generalist, denied Kallail's request for a straight day shift as an accommodation. The letter stated that "[t]he Resource Coordinator's essential functions require rotating shifts and emergency call-ins to support daily electric and gas operations 24 hours a day 7 days a week to meet company and public safety requirements." As an alternative accommodation, Alliant said it would consider reassigning Kallail "to another vacant position with a straight day shift for which she was qualified." Breitbach asked Kallial to e-mail a request if she wanted "to proceed with identifying possible vacant positions for reassignments." On May 12, 2005,

-3-

Kallail requested that Sue Kleisch, Human Resources Compliance Manager, review the decision.

On August 9, 2005, in response to the April 12 letter from Breitbach, Kallail notified Breitbach that she would consider reassignment to another position. Kallail told Breitbach that she had requested review of the April 12 decision, but had received no response from Kleisch. Kallail then spoke to Kleisch about her request for reassignment. The company later provided Kallail with a list of three open positions for which she could apply through the normal process. Kallail informed Kleisch that she was not interested in any of the three positions because one required walking, which she was unable to do, one paid less than her current position, and one would have required her to relocate or to commute a significant distance to work.

Due to surgery on her leg, Kallail commenced leave under the Family and Medical Leave Act on September 12, 2005. During her recovery from surgery, Kallail suffered an infected toe that doctors ultimately amputated. Kallail was initially scheduled to return to work on December 5, 2005, but Alliant granted her request to extend the leave through February 13, 2006.

While on leave, Kallail applied for a DDC Administrator position. The position had a straight eight-hour day shift schedule, and was two job grades higher than Kallail's current Resource Coordinator position. Kallail was one of six applicants to receive an interview, but Alliant hired another candidate.

Kallail returned to work on February 13, 2006, pursuant to a release from her physician, with a restriction that she work only an eight-hour day-shift schedule until May 13, 2006. Alliant gave Kallail a temporary light-duty assignment, subject to her physician's restrictions, in which she performed certain administrative tasks. The tasks—training new hires and drafting training materials, among others—were different from her normal work responsibilities as a Resource Coordinator.

On March 20, 2006, Kallail submitted to Alliant a second request for accommodation, and again requested a permanent day shift. Kallail then submitted a proposed schedule in which she, along with a teammate, would work a regular eight-hour day shift, while the remaining Resource Coordinators continued to work rotating shifts.

When Kallail's temporary light-duty assignment expired, Dr. Stahlberg again recommended that Kallail be permanently limited to straight day shifts to protect her from complications and risk throughout the rest of her life. Based on this restriction, Alliant did not reinstate Kallail to her Resource Coordinator position, and allowed her to use paid leave benefits while Alliant explored possible open positions for which she was qualified and to which she could be reassigned.

On June 19, 2006, Alliant offered Kallail reassignment to a Customer Operations Assistant II position in Cedar Rapids. Kallail declined the position, and applied for and received short-term disability benefits beginning June 23, 2006. Over the following several months, Kleisch and Breitbach continued to work with Kallail to find a position at Alliant. They forwarded her information about a Team Lead Billing position, but Kallail decided not to apply for the position because she would not have been qualified. Breitbach and Kleisch also offered Kallail a position as a Construction Specialist, but she declined the offer because of new health complications. Kallail did not apply for any other positions with Alliant, and, effective January 1, 2007, she began to receive long-term disability benefits under Alliant's disability plan.

Kallail filed charges against Alliant with the Cedar Rapids Civil Rights Commission ("CRCRC"), the Iowa Civil Rights Commission ("ICRC"), and the Equal Employment Opportunity Commission ("EEOC"), alleging that Alliant discriminated against her based on disability by failing to provide her with a reasonable accommodation. After these agencies took no action and advised Kallail

of her right to sue, she filed a complaint in Iowa District Court, alleging that Alliant failed to make reasonable accommodation for Kallail's disability. Alliant removed the case to federal court. Alliant then moved for summary judgment, arguing that Kallail was not a qualified individual under the ADA, because she could not perform an essential function of her position. The district court granted summary judgment in favor of Alliant.

## II.

We review the district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in the light most favorable to Kallail, the nonmoving party. *Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 903 (8th Cir. 2010). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Kallail alleges disability discrimination under both the ADA and the ICRA. "[D]isability claims under the ICRA are generally analyzed in accord with the ADA," *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007), and Kallail does not urge any distinction between the two claims.

The ADA makes it unlawful for a private employer to discriminate against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "Discrimination" is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id*. § 12112(b)(5)(A). To establish a *prima facie* case of discrimination under the ADA, an employee must show that she (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment decision because of the disability. *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007). To be a qualified individual under the ADA,

an employee must "(1) possess the requisite skill, education, experience, and training for [her] position; and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003) (internal quotation omitted); *see also* 42 U.S.C. § 12111(8).

Kallail claims that Alliant violated the ADA by refusing to accept her proposal to work a regular eight-hour day shift as a Resource Coordinator. For purposes of this appeal, Alliant does not dispute that Kallail is disabled or that she has suffered an adverse employment action. Alliant also does not dispute that Kallail possessed the requisite skill, education, experience, and training for her position. The disputed issue, then, is whether Kallail was able "to perform the essential functions of her job, with or without reasonable accommodation." *Fenney*, 327 F.3d at 712.

Kallail argues that the district court erred in concluding that the rotating shift was an essential function of the Resource Coordinator position. She contends that she was able to perform the essential functions of the position, which did not include the rotating shift, with a reasonable accommodation.

We first address whether the rotating shift was an essential function of Kallail's position. Although an employee retains the ultimate burden of persuading the trier of fact that he or she can perform the essential functions of a position, "much of the information which determines those essential functions lies uniquely with the employer." *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995). Essential functions of a position are the fundamental duties of the job, but not its marginal functions. *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir. 2006). In determining whether a job function is essential, we must consider, among other evidence, the following:

(i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents on the job; and/or (vii) [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3); *see also Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007).

A rotating shift can be an essential function of a position, *Rehrs*, 486 F.3d at 359, and we agree with the district court that it was an essential function of the Resource Coordinator position at Alliant. Alliant has determined that the rotating shift is essential to the Resource Coordinator position, and lists it as a requirement on the written job description for the position. According to Alliant, the rotating shift provides enhanced experience and training for Resource Coordinators by allowing them to become familiar with all geographic territories in Alliant's service area, and to receive on-the-job training by working with different partners and Senior Resource Coordinators. This enhanced training also allows Alliant to handle emergencies more effectively, because each Resource Coordinator summoned during an emergency will have experience working in all geographic areas and with all personnel. Shift rotation also enhances the non-work life of Resource Coordinators by spreading the less desirable shifts—nights and weekends—among all Resource Coordinators. If Kallail were switched to a straight day shift and not required to work the rotating shift, then other Resource Coordinators would have to work more night and weekend shifts.

Kallail argues that there is a genuine issue of material fact as to whether a rotating shift was an essential function of the Resource Coordinator position.

According to Kallail, Alliant's prior consideration of a proposal to create straight day shifts, the Wisconsin DDC's use of straight day shifts, and statements from Alliant employees about the possibility of Kallail working a straight shift all undercut Alliant's claim that the rotating shift was an essential function.

Kallail first points to Alliant's 2002 consideration of a proposal to create two permanent straight day shifts for Resource Coordinators. According to Kallail, a committee considered the costs and benefits of adding the shifts, and a consensus emerged that the addition would better serve the business needs of Alliant. Alliant was prepared to add the shifts, but the company abandoned the proposal after employees objected to the proposed method for determining which Resource Coordinators would receive the shifts. Kallail faults the district court for placing too much weight on testimony from Alliant employees that the company made the decision to continue with rotating shifts based on Alliant's business needs. Kallail's explanation for the abandonment of the proposed addition of the day shifts, however, does not conflict with the explanation from Alliant. To avoid employee complaints and maintain morale are legitimate business reasons for a scheduling decision. The fact remains that, despite considering the proposal, Alliant chose not to add the day shifts for reasons unrelated to disability. So long as Alliant's decision in 2002 was not discriminatory, "[i]t is not the province of the court to . . . determine what is the most productive or efficient shift schedule for a facility." *Rehrs*, 486 F.3d at 358.

Kallail next points to the fact that the Alliant DDC operating in Wisconsin uses permanent eight-hour shifts. But the DDC facility in Wisconsin makes its scheduling decisions based on a different set of circumstances. It provides emergency dispatching in a different manner by turning the task over to field operations during all storms, while the DDC in Cedar Rapids shifts the responsibility to field operations only for major storms. The two DDC facilities had independent business reasons for their different scheduling decisions. The difference in scheduling is thus insufficient

-9-

to show that the rotating shift at the DDC in Cedar Rapids was not an essential function of the Resource Coordinator position.

Kallail also points to a series of statements made by Alliant employees regarding the possibility of Kallail working a straight shift instead of a rotating shift. These statements include (1) a letter from Kallail's doctor, Dr. Stahlberg, that Alliant told her a straight night shift was available for Kallail, (2) a statement from a human resources employee at Alliant to Dr. Stahlberg that Alliant "may be able to accommodate a straight evening/night shift" for Kallail, (3) a statement from Vern Gephart, a Vice President at Alliant, to Kallail's husband that a "new job" with straight day shifts would be available to Kallail when she returned from her medical leave, (4) a statement from Mark Reynolds, Kallail's supervisor, that a straight day shift would have been possible in 2005 with some creativity in crafting the schedule for the year, and would not have been a problem in 2006, and (5) a statement from Gary Heinrichs, DDC Manager, that Kallail's proposed straight day shift was dismissed because Alliant did "not want to" do it.

Kallail argues that this evidence shows, according to Alliant's own statements, that a straight shift was possible, and that a rotating shift was therefore not an essential function. Kallail does not claim, however, that Alliant provided a formal offer that she could work a straight shift in her Resource Coordinator position. The statement from Gephart that a position with straight day shifts would be available to Kallail when she returned from medical leave referred to a "new job," not to the Resource Coordinator position. At most, therefore, the statements of Alliant employees show that the company considered the possibility of providing a straight day shift for Kallail in the Resource Coordinator position, but chose not to do so. As with Alliant's 2002 consideration of a proposal to create permanent day shifts, it is not the role of the courts to question Alliant's legitimate business reasons for making this decision.

In sum, the evidence presented by Kallail—Alliant's 2002 consideration of a straight day shift proposal, the fact that the DDC in Wisconsin uses a straight day shift, and evidence that Alliant considered a straight day shift for Kallail—is insufficient to raise a genuine issue of material fact. We thus conclude that the rotating shift was an essential function of the Resource Coordinator position.

Because we conclude that the rotating shift is an essential function of Kallail's position, and Kallail concedes that she is unable to work a rotating shift *without* a reasonable accommodation, we next address whether Kallail could perform the essential functions *with* a reasonable accommodation. *See Fjellstad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999). Kallail must "make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job." *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003).

Kallail initially sought a straight day shift as an accommodation for her disability. This accommodation would not have allowed Kallail to perform the essential functions of her current position, however, because it would have eliminated one of those functions—the rotating shift. While job restructuring is a possible accommodation under the ADA, an employer "need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *Fjellstad*, 188 F.3d at 950; *see also Rehrs*, 486 F.3d at 358; *Benson*, 62 F.3d at 1112-13. Kallail therefore failed to make a facial showing that she can be accommodated in her current position.

Even though an accommodation was not possible in her current position, reassignment to a vacant position may be a reasonable accommodation. *Burchett*, 340 F.3d at 517; *see also Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1018 (8th Cir. 2000). Alliant offered to reassign Kallail to another position as a Customer Operations Assistant II. If an employer has offered reassignment as a

reasonable accommodation, then "the employee must offer evidence showing both that the position offered was inferior to [her] former job and that a comparable position for which the employee was qualified[] was open." *Rehrs*, 486 F.3d at 359. Kallail did not present such evidence. Kallail does argue that Alliant should have accommodated her by hiring her for the DDC Administrator position, but a company need not make a promotion to satisfy the ADA. *Cravens*, 214 F.3d at 1019.

Kallail also argues that Alliant failed to engage in an interactive process with her to determine whether a reasonable accommodation was possible. There is no *per se* liability under the ADA if an employer fails to engage in an interactive process, but "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is *prima facie* evidence that the employer may be acting in bad faith." *Fjellstad*, 188 F.3d at 952. To show that an employer failed to participate in the interactive process, an employee must show that: (1) the employer knew of the employee's disability; (2) the employee requested accommodations or assistance; (3) the employer did not in good faith assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002). Kallail is unable to meet the fourth requirement, because Alliant did reasonably accommodate Kallail by offering her the position of Customer Operations Assistant II. We therefore conclude that Kallail has failed to show that Alliant did not engage in an appropriate interactive process with her.

Because Kallail was unable to perform the essential functions of her position, with or without reasonable accommodation, she has failed to make a *prima facie* showing of discrimination under the ADA.

-12-

## III.

Kallail also argues on appeal that Alliant violated the ADA by refusing to hire her as the DDC Administrator because of her disability. Apart from an employer's duty to make reasonable accommodations to the disability of an otherwise qualified applicant or employee, an employer may not refuse to hire a qualified individual because she has a disability. *Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 990 (8th Cir. 2007). Kallail, however, did not raise a claim based on the latter prohibition in the district court, and the district court never addressed it. In her complaint, Kallail listed only one count of discrimination, and described it as follows: "Defendant Alliant Energy Corporate Services, Inc. was aware that Plaintiff had Diabetes, and Plaintiff *sought to be reasonably accommodated* for her disability. Defendant *failed to reasonably accommodate* Plaintiff." R. Doc. 2, ¶ 50 (emphases added). In response to Alliant's motion for summary judgment, Kallail discussed the company's refusal to hire Kallail for the DDC Administrator position, but only in the context of Alliant's alleged failure to make reasonable accommodation for Kallail. She argued that "[r]efusing to hire the superior applicant because of a disability cannot be construed as a reasonable accommodation." The district court understandably did not address a separate claim that Alliant violated the ADA by refusing to hire Kallail because of her disability, and we decline to consider it for the first time on appeal. *See Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 725 (8th Cir. 2002).

\*       \*       \*

For these reasons, the judgment of the district court is affirmed.

_____

-13-