# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1109

_____

Mark Minnihan

*Plaintiff - Appellant*

v.

Mediacom Communications Corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: November 13, 2014
Filed: March 9, 2015

_____

Before RILEY, Chief Judge, BEAM and GRUENDER, Circuit Judges.

_____

BEAM, Circuit Judge.

Mark Minnihan sued his former employer, Mediacom Communications Corporation (Mediacom), alleging discrimination in violation of the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), 42 U.S.C. §§ 12101 et seq., and the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216. The district court[1]

_____

[1]The Honorable James E. Gritzner, Chief Judge, United States District Court for the Southern District of Iowa.

concluded Minnihan was not a qualified individual for the purposes of the ADAAA and the ICRA, granted summary judgment in favor of Mediacom, and dismissed the complaint. Minnihan appeals, and we affirm.

## I. BACKGROUND

Minnihan worked for Mediacom, a communications company, and its predecessor, for more than thirty years. From July 2001 until May 2011, Minnihan was a technical operations supervisor (TOS) in Mediacom's Ames, Iowa, facility.

As a TOS, Minnihan's primary responsibilities were to supervise, train, and support the technicians installing cable and internet services in customers' homes, as well as to respond to customers' service needs. As part of these responsibilities, Minnihan was required to perform thirteen to fourteen Quality Control checks (QCs) on each technician under his supervision each quarter.[2] Mediacom wanted TOSs to conduct QCs independently. The way Minnihan performed QCs before he was restricted from driving, and the way all other TOSs conducted QCs, was to go to the job site after a technician completed a job to inspect the technician's work and determine if the technician was meeting Mediacom's standards. Minnihan's duties also required him to supervise his technicians by doing "tech ride-alongs," where Minnihan would observe technicians performing installation and service calls on the job site.

Another part of Minnihan's job was to respond to customer complaints, or escalated trouble calls. When Mediacom received such a complaint, either a different technician or the supervising TOS of the original technician would drive to the customer's home, discuss the complaint, and fix the technical issue if it had not

_____

[2]From 2008 to 2011 Minnihan was in charge of approximately twelve or thirteen technicians.

already been resolved. Other duties of the TOS position included: being on call twenty-four hours a day, and seven days a week to respond to cable outages; conducting accident investigations when field technicians were involved in an accident; performing unannounced safety checks on technicians; delivering equipment to technicians in the field; or accompanying technicians taking Mediacom vehicles in for repairs.

To facilitate his job, Mediacom provided Minnihan, and all individuals in the TOS position, a company vehicle, which they expected the TOSs to use while driving to and from work, performing their responsibilities during the day, and responding to outages after regular work hours. Mediacom and Minnihan dispute exactly how much of Minnihan's time was spent working out in the field, but at a minium Minnihan agrees fifty percent of his working hours were spent outside of the office.

On December 1, 2009, Minnihan experienced a seizure at work, and as a result was restricted from driving for six months. Iowa law prohibits an individual who has experienced a seizure from driving "until that person has not had an episode of loss of consciousness or loss of voluntary control for six months." Iowa Admin. Code r. 761-600.4(4). Mediacom accommodated Minnihan's December 2009 seizure and subsequent restriction from driving by reallocating his driving responsibilities to other employees. This included having Minnihan ride along with the technicians he was supervising to get to job sites, sometimes having other employees drive Minnihan to job sites, and reassigning some of Minnihan's responsibilities to other employees. Minnihan testified that his assistant, Dave Hutchison, and another employee, Thor Carlstrom, were already performing some of his duties that involved driving–mainly QCs–before his driving restriction began. To complete the QCs not already being covered, while his driving was restricted, Minnihan would perform QCs in the technicians' presence during tech ride-alongs.

-3-

On March 30, 2010–before Minnihan's driving restriction from the December 2009 seizure had expired–Minnihan experienced another seizure at work, which triggered a new six-month driving restriction. After Minnihan's March 2010 seizure, Bobby Gadams, Senior Manager of Human Resources for Mediacom's west Iowa region; Pamela Wellman, Senior Director of Human Resources; Judith Mills, Vice President of Human Resources; and Steve Purcell, Regional Vice President for the west Iowa region, discussed the situation and determined that Mediacom could no longer accommodate Minnihan. On May 7, 2010, Gadams sent a letter to Minnihan informing him that Mediacom could no longer offer him an accommodation for his driving restriction because driving was an essential function of the TOS position. In the letter, Mediacom gave Minnihan fourteen days to apply for positions at Mediacom which did not require driving. Minnihan did not apply for other positions at Mediacom during the fourteen-day time period and, on May 20, 2010, Pamela Walker, Minnihan's attorney, sent Mediacom a letter on Minnihan's behalf threatening legal action unless Minnihan was allowed to remain employed with Mediacom in the TOS position.

From May 25, 2010, to July 25, 2010, Mediacom, Minnihan, and his attorney, corresponded regarding Minnihan's situation. Additionally, Gadams, Tim Adreon, Minnihan's direct supervisor, and Rod Cundy, Adreon's supervisor, met with Minnihan on July 20, 2010, to discuss comparable non-driving jobs Minnihan could apply for. Minnihan also received a memo at this meeting, which provided information about two available non-driving positions in the Des Moines office, and stated that if Minnihan did not apply for a position, or did not accept a position once offered, his employment with Mediacom would be terminated on July 26, 2010. There were no open positions in the Ames facility at that time. Gadams encouraged Minnihan to use company time to learn about the available positions, and expressed his wish that Minnihan stay with Mediacom.

-4-

On July 25, 2010, Minnihan sent Gadams an email indicating that he did not feel the two suggested positions were feasible because they were located in Des Moines. Minnihan's email also recommended three alternatives. First, he suggested Mediacom continue to accommodate him in the TOS position until October when his driving restriction would be lifted. Second, Minnihan inquired about taking Family Medical Leave (FMLA) until October. Finally, he suggested his current TOS position be restructured to include only non-driving duties. After receiving this email, Mediacom decided to continue to accommodate Minnihan until October, since it was only a few months away and they wished to retain a long-term valued employee. Additionally, Mediacom realized that if Minnihan did take FMLA leave until October they would be even more burdened, since they would not be able to fill his position during the interim period. On October 4, 2010, Minnihan's doctor cleared him to drive, and Minnihan resumed all his regular duties as a TOS.

On April 5, 2011, Minnihan experienced a third seizure at work, and was again restricted from driving for six months. Following Minnihan's April 2011 seizure, Mediacom decided to transfer Minnihan to the Des Moines office as a Network Operations Center (NOC) Operator, a non-driving position with the same pay and benefits as the TOS position. After this offer was communicated to Minnihan, Minnihan's attorney sent a letter to Mediacom stating that a transfer to a position in Des Moines was not a reasonable accommodation because Minnihan's driving restriction made him unable to commute to work in Des Moines. Mediacom completed the paperwork to transfer Minnihan to the NOC position in Des Moines on April 14, 2011.

From April 15, 2011, to May 16, 2011, Mediacom gave Minnihan time to decide if he would accept the transfer to Des Moines and arrange transportation, or to submit paperwork to take FMLA leave. On April 26, 2011, Minnihan did not report to work for the NOC position in Des Moines. Later that same day, Wellman sent Minnihan a letter detailing possible transportation options between Ames and

Des Moines, including the name of another Mediacom employee who commuted from Ames to Des Moines that Minnihan could ride with, and a list of websites that contained information on rideshares and public transportation between Ames and Des Moines. On April 27, 2011, Minnihan sent an email to Wellman asking whether there were any jobs that he could do out of the Ames office, and alternatively suggesting again that Mediacom restructure his TOS position in Ames to make it non-driving, and hire a second TOS to handle the responsibilities that required driving. Wellman replied to Minnihan on April 29, 2011, stating that there were no open non-driving jobs in Ames with comparable pay to his TOS position. Wellman also responded that creating a second TOS position would cause Mediacom undue hardship, and was not a reasonable accommodation.

On May 2, 2011, Mediacom sent Minnihan a letter stating that if he did not report for work at his new NOC position in Des Moines, or submit paperwork for FMLA leave by May 10, 2011, that his employment would be terminated. On May 16, 2011, a letter terminating Minnihan's employment was sent to Minnihan by Mediacom. The letter noted that Minnihan had neither reported for work, called in to report an absence, nor applied for medical leave, and that the reason for his termination was his recurring absences without notice or approved leave.

After Minnihan's employment with Mediacom was terminated, he filed a claim with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC) alleging Mediacom discriminated against him in violation of the ICRA and the ADAAA. After receiving his right to sue letters from the ICRC and the EEOC, Minnihan filed suit against Mediacom in Iowa state court. Mediacom timely removed the action to federal court. Mediacom filed a motion for summary judgment, arguing that Minnihan was not a qualified individual for the purposes of disability law because he could not perform the essential functions of his job. The district court granted summary judgment in favor of Mediacom. Minnihan appeals.

## II.    DISCUSSION

### A.    Standard of Review

We review de novo the district court's grant of summary judgment, viewing the record in the light most favorable to Minnihan, the non-moving party. Kallail v. Alliant Energy Corporate Servs., Inc. 691 F.3d 925, 929 (8th Cir. 2012). We must affirm the grant of summary judgment if there are no genuine issues of material fact, and the movant, Mediacom, is entitled to judgment as a matter of law. Id. at 929-30. Fed. R. Civ. P. 56(c). In resisting the motion for summary judgment, the nonmoving party must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "[E]vidence [that] is merely colorable, [ . . . ] or is not significantly probative" cannot be the basis for a denial of summary judgment. Id. at 249-50 (internal citations omitted).

### B.    ADAAA[3] and ICRA Claims[4]

---

[3]In 2008, Congress amended parts of the Americans with Disabilities Act (ADA), largely to clarify what qualified as a disability, and the updated law is now called the ADAAA. For the purposes of the instant appeal, the analysis remains the same under the ADA or the ADAAA. Accordingly, these terms are used interchangeably throughout this opinion.

[4]Minnihan makes claims of disability discrimination under both the ADAAA and the ICRA. In the past, disability claims under the ICRA have been analyzed in accord with the ADA. Kallail, 691 F.3d at 930. The district court and both parties operated under the assumption that, with respect to Minnihan's case, the ICRA was still in agreement with the ADAAA, since it is undisputed that Minnihan suffered from a disability. Accordingly, we analyze Minnihan's ICRA claim in accord with his ADAAA claim, but we otherwise make no legal or factual determinations about the ICRA's relation to the ADAAA.

To establish a prima facie case of discrimination under the ADAAA, a plaintiff must show that (1) he is a disabled person within the meaning of the ADAAA; (2) he was qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. E.E.O.C. v. Wal-Mart Stores, Inc., 477 F.3d 561, 568 (8th Cir. 2007). In order to be a qualified individual for the purposes of the ADAAA, the plaintiff must "(1) possess the requisite skill, education, experience, and training for [the] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 712 (8th Cir. 2003) (quotation omitted). Additionally, the inquiry of whether an employee is a qualified individual is not limited to the employee's existing job, but instead, under certain circumstances, may also include other company jobs that the disabled employee desires. Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1017 (8th Cir. 2000). Mediacom argues that Minnihan was not a qualified individual because he was not able to perform the essential functions of his job, with or without a reasonable accommodation. Minnihan asserts that the district court erred in concluding that driving was an essential function of the TOS position. He contends that he was able to perform the essential functions of his position with a reasonable accommodation.

Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). To determine whether a job function is essential, we consider factors from the ADA implementing regulations, including:

> (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; . . . [and] (vii) [t]he current work experience of incumbents in similar jobs.

-8-

Kallail, 691 F.3d at 930 (first, second, third, fourth and sixth alterations in original). Although Minnihan makes a showing of contesting each of the above listed factors, he fails to produce sufficient evidence that is more than merely colorable or that is significantly probative enough to raise a genuine issue of material fact. The only factor Minnihan arguably comes close to genuinely contesting is the fourth, the consequences of not performing the function.

During the time Minnihan was legally restricted from driving, Mediacom accommodated Minnihan by allowing him to remain in the TOS position without driving.[5] The time period during which Mediacom accommodated Minnihan illustrates the consequence of Minnihan not performing the function of driving in the TOS position. The parties disagree about the effect Minnihan's accommodation had on the company. Adreon and Hutchison testified that they and other employees worked additional hours in order to complete Minnihan's driving-related duties. Hutchinson also testified that he worked additional hours to make up for time spent driving Minnihan to locations off-site. Minnihan does not dispute that other employees had to put in extra time due to his driving restriction, but disagrees with how much additional time they worked, or how often other employees drove him to jobs off-site. However, Minnihan conceded in his affidavit, that during the period he was restricted from driving, there were times when he would have to ask other employees to perform tasks for him, or have other employees drive him to an off-site location.

Minnihan argues further that the mere fact Mediacom was able to accommodate him is evidence that driving was not an essential function of the TOS position. He relies on Kammueller v. Loomis, Fargo & Co., 383 F.3d 779 (8th Cir. 2004) for the

---

[5]Aside from Minnihan, Mediacom had never previously exempted an individual in the TOS position from driving for longer than a few weeks.

proposition that Minnihan being able to "function effectively" as a TOS during the time he was restricted from driving supports a finding that driving was not in reality an essential function of the TOS position. In Kammueller, the court reversed the trial court's grant of summary judgment in favor of the employer after finding a genuine issue of material fact existed as to the consequences of the employee not performing a job function. The employee, a driver/guard for an armored truck company, had been previously accommodated, due to a disability, and exempted from the employer's requirement of being able to lift up to fifty pounds. Several months after laying off fifty employees, the employer decided it could no longer accommodate the employee's lifting restriction, and he was terminated. Id. at 783. Ultimately, the court in Kammueller concluded that there was a material question of fact as to whether "the consequences of excusing [the employee] from certain job functions were sufficiently severe to consider those job functions essential." Id. at 787.

However, Kammueller is distinguishable from the instant case. In Kammueller, the employee was exempted from the lifting requirement for a period of six years. Just months before he was terminated, the employer agreed to continue the employee's accommodation, even after a significant reduction in force. Then, for unexplained reasons, the employer changed its mind and decided to enforce the lifting requirement against the employee, thus resulting in his termination. In the instant case, Mediacom exempted Minnihan from driving off and on for a total period of ten months. Unlike in Kammueller, Mediacom did not abruptly and inexplicably change its mind about accommodating Minnihan; Mediacom informed Minnihan within the first five months of his driving restriction that it would be unable to permanently accommodate his driving restriction. More importantly, there was no evidence in Kammueller that the employee's accommodation resulted in other employees having to assume additional duties, or work additional hours. In Minnihan's case, even though he disputes the amount of extra time other employees worked due to his accommodation and how often it was necessary for him to work in the field, he conceded that while he was restricted there were times when he would have to ask

-10-

employees to perform tasks for him, or have an employee drive him to a job off-site. Thus, Kammueller does not bear the weight Minnihan attempts to place on it.

At bottom, for established public policy reasons, "[a]n employer does not concede that a job function is non-essential simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous." Rehrs v. Iams Co., 486 F.3d 353, 358 (8th Cir. 2007) (alteration in original) (quotation and internal quotation omitted). We have held that "to find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of the employers." Id. (quotation omitted). For these important reasons, Minnihan's arguments that Mediacom was able to conduct business while accommodating him does not raise a material question of fact on this issue.

"The employer's judgment about an essential job function is considered highly probative." Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 914 (8th Cir. 2013) (internal quotation omitted). But, the employer's judgment is not conclusive. Kammueller, 383 F.3d at 786. In the instant case, it is undisputed that Mediacom considered driving an essential function of the TOS position. The essential nature of driving to the TOS job is further illustrated in the written job description for the position. While the ability to drive is not specifically listed, the TOS job description states "[v]alid driver's license with good driving *required*." J.A. at 471 (emphasis added). Furthermore, many of the specific responsibilities set out in the job description could only be performed on location in customers' homes, which supports a finding that driving was an essential function of the job. See Dropinski v. Douglas Cnty, Neb., 298 F.3d 704, 708-09 (8th Cir. 2002) (finding certain job functions were essential, even though they were not listed in the written job description, because they were inherently required to perform the written job functions).

-11-

We have held that a task may be an essential function even if the employee performs it for only a few minutes each week, and even if other employees are available to perform the task for the disabled employee. See Summerville v. Trans World Airlines, Inc., 219 F.3d 855, 858-59 (8th Cir. 2000). Neither party, nor the district court, established with any specificity how much time Minnihan, or any TOS, spent actually *driving*. While it is unclear how much time Minnihan spent driving in the TOS position, it is clear from the record that the time Minnihan spent driving facilitated his ability to be out in the field, which Minnihan agreed was where he spent at least fifty percent of his working hours. Minnihan's allegation that the instances in which he was required to leave the office to complete his responsibilities were "rare" is of no consequence in our analysis, because it is the general experience and expectations of all individuals in the TOS position, not Minnihan's personal experience, which establishes the essential functions of the job. Dropinski, 298 F.3d at 709. Given all these factors, we find that driving was an essential function of the TOS position.

Even with our finding that driving was an essential function of the TOS position, Minnihan could still be considered a qualified individual for the purposes of the ADAAA and the ICRA, if he made a facial showing that he was able to complete the essential function of his job with or without an accommodation. Kallail, 691 F.3d at 932. Minnihan makes no such showing. Iowa law made it illegal for Minnihan to drive, an essential function of his job, during the time of his restriction, and no accommodation could change that. He contends that restructuring his TOS position to only include non-driving duties would have been a reasonable accommodation. Although restructuring is one of the possible accommodations under the ADAAA, an employer "is not required to reallocate the essential functions of a job." Dropinski, 298 F.3d at 707 (quotation omitted). Additionally, we have held that "an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated" under the ADA. Rehrs, 486 F.3d at 357. Minnihan conceded that during the time Mediacom accommodated him other

-12-

employees had to perform tasks for him, or drive him to off-site locations. He also conceded that other employees at times had to work additional hours as a result of his accommodation.

Thus, given that driving was an essential function of the TOS position, and that Minnihan was unable to complete this function with a reasonable accommodation, we find that Minnihan was not a qualified individual under the ADAAA and the ICRA. Accordingly, Minnihan failed to present a prima facie case of disability discrimination and Mediacom was entitled to judgment as a matter of law.[6]

### C. Reasonable Accommodation and Mediacom's Engagement in the Interactive Process

Lastly, Minnihan asserts that Mediacom failed to offer Minnihan a reasonable accommodation or engage in the interactive process in good faith. We disagree.

There is no per se liability under the ADA if an employer fails to engage in the interactive process. Cravens, 214 F.3d at 1021. However, at the summary judgment stage "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." Id. (quotation omitted). An employee with a disability must show the following elements to establish his employer failed to participate in the interactive process:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the

---

[6]Minnihan also argued that the district court erred in finding that he had not suffered an adverse employment action when Mediacom decided to transfer Minnihan to the non-driving NOC position in Des Moines. Since we have already determined that Minnihan failed to establish a prima facie case for disability discrimination, we decline to address this issue.

-13-

employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Id. It is not disputed that Mediacom knew about Minnihan's disability, and that Minnihan requested assistance for his disability. Minnihan argues that Mediacom failed to participate in an interactive process because it did not determine how to retain him in the TOS position. However, "a disabled individual is not entitled to an accommodation of his choice." Rehrs, 486 F.3d at 359. As discussed above, Mediacom was not required to restructure the TOS job to accommodate Minnihan, because it would have required Mediacom to reallocate essential functions of the job. Viewing the evidence in the light most favorable to Minnihan, the record is clear that Mediacom made a good faith effort to assist Minnihan in finding a reasonable accommodation. Several members of Mediacom's Human Resources department, as well as Minnihan's supervisors, spoke with him over a period of months regarding possible accommodations. In addition to responding to his inquires about the availability of other positions in the Ames office and the possibility of restructuring his TOS position, Mediacom provided Minnihan with information about other jobs within the company, as well as giving him time on the job to apply for other positions. This evidence shows that Mediacom did engage in an interactive process with Minnihan to find an accommodation.

In fact, not only did Mediacom engage in an interactive process, the record shows Mediacom offered Minnihan a reasonable accommodation, which he declined to accept. We have found that in certain situations, reassignment to a vacant position can be a reasonable accommodation, where the employee can perform the essential functions of the new position. Cravens, 214 F.3d at 1017-20. Reassignment is not required of employers in every instance, however, and is "an accommodation of last resort" when the employee cannot be accommodated in his existing position. Id. at 1019. In the case of a reassignment, the employer is not required to create a new

-14-

position or move other employees from their jobs in order to open up a position.  Id. Rather, reassignment to another position is a required accommodation only if there is a vacant position for which the employee is otherwise qualified.  Id.

Because Minnihan could not drive–an essential function of the TOS position–with or without a reasonable accommodation, Mediacom could not, and was not required, to accommodate him in the TOS position.  Given this situation, transferring Minnihan to a different position was the only reasonable accommodation available.  However, Minnihan declined to accept Mediacom's transfer to the NOC position by failing to report for work, or request leave time, and as a result he was terminated.  In order for an employee to prevail on an ADA claim where the employer has offered the employee reassignment as a reasonable accommodation, "the employee must offer evidence showing both that the position offered was inferior to [his] former job and that a comparable position for which the employee was qualified, was open."  Rehrs, 486 F.3d at 359 (alteration in original) (quotation omitted). Minnihan provides no evidence that the NOC position was inferior to  the TOS position, and the record is clear that there were no comparable, non-driving positions open in the Ames office during the time Minnihan and Mediacom were engaged in the interactive process to find a reasonable accommodation.  Thus, Minnihan has failed to show that Mediacom did not offer him a reasonable accommodation.

## III.  CONCLUSION

For all the reasons set out above, we affirm.

_____

-15-