# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3101

_____

Glena Tjernagel,

             Appellant,

      v.

The Gates Corporation, doing
business as The Gates Rubber
Company,

             Appellee.

\* \* \* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
Southern District of Iowa.

_____

Submitted: April 17, 2008
Filed: July 9, 2008

_____

Before WOLLMAN, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

After Glena Tjernagel (Tjernagel) was dismissed from her job, she sued her former employer, The Gates Corporation (Gates), under the Americans with Disabilities Act (ADA), the Iowa Civil Rights Act (ICRA), and the Family Medical

Leave Act (FMLA).[1]  The district court[2] granted summary judgment for Gates on all claims, concluding Tjernagel did not establish she was disabled as a matter of law.  Tjernagel appealed.  We affirm.

## I.    BACKGROUND

In May 1995, Tjernagel was employed by Gates at its Boone, Iowa, plant as a part-time production employee, switching to full-time employment in August 2004.  At its Boone plant, Gates manufactures hydraulic and industrial hoses.  Tjernagel's job description included the following demands: "repetitive body movements[,] particularly fingers, hands, legs, and feet"; "work . . . performed from a standing position" with "frequent . . . twisting, bending, lifting, pulling and leaning"; "[c]onstant use of a foot pedal from the standing position placing weight on one foot"; "lifting and carrying . . . up to 40 pounds"; "[r]eaching for, lifting and carrying . . . material and/or equipment weighing up to 40 pounds"; "[p]ulling hose off reels or bales"; "[p]ushing and/or pulling fully loaded material . . . carts"; operating equipment; "[a] high percentage of attendance and on time arrival"; "[a]bility to handle several tasks"; "deal with deadlines and production objectives"; and ability to "[c]hange from one job to another to meet customer requirements."  The job description noted work was performed in eight hour shifts and "[o]vertime is required to meet production demands and can include Saturdays and Sundays when necessary."  In 2005, Gates's Boone employees worked twenty-two Saturdays.  There were no permanent or regular light duty production positions at the plant.  While there was an office with office jobs, Tjernagel never worked in the plant office.

---

[1]The FMLA claim is not a subject of this appeal.  Tjernagel also alleged retaliation, but does not appeal the adverse ruling on her retaliation claim.

[2]The Honorable Thomas J. Shields, United States Magistrate Judge for the Southern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

At the time of Tjernagel's termination, and for several months before her termination, plant employees were required to rotate among production line positions. For example, Line 5, where Tjernagel was working during the last several months before her termination, rotated approximately every two hours. Rotation was done to reduce the risk of repetitive use injuries, to allow cross-training and to promote team work. On Line 5, positions included hose cutter (for which Tjernagel was not trained), skiving, putting on couplings, putting cloth guard over the hose, scrunching the guard, two crimping positions, putting caps on the ends of the hose, and packing the hose for shipment. Scrunching must be done standing, but most other jobs could be performed, at least part of the time, while sitting.

In May 2005, Tjernagel was first diagnosed with multiple sclerosis (MS). Later that summer, a different physician clarified her condition as clinical isolated syndrome (CIS) which differs from MS only by the number of clinically diagnosed attacks (i.e., multiple sclerosis requires "multiple" attacks). Tjernagel described her CIS symptoms as extreme fatigue; problems standing, walking, and breathing; problems with her short term memory; and numbness and tingling in her body. Tjernagel also "thought" her eyesight "might" be affected.[3]

In the summer of 2005, Tjernagel told human resources manager Connie Sorenson (Sorenson) she had MS. Sorenson, whose mother had MS, said, "If you need to take extra breaks . . . to sit down, whatever you need, let us know." Sometime between July and September 2005, Tjernagel began leaving the production area to sit down. She did not always give advance notice when leaving her work station, did not clock out, and was paid for her time. Gates documented Tjernagel left her work station

---

[3]Tjernagel was diagnosed with carpal tunnel syndrome in the summer of 2005 which she asserts impacted her ability to do her job as early as February 2005. We do not consider Tjernagel's carpal tunnel syndrome because her claim here is solely based on her CIS. ("[T]he basis for [my] disability claim is [my] CIS and not my carpal tunnel syndrome.")

about twenty times. Sometimes Tjernagel would come back later in her shift, and other times she would not return at all. As early as August, Tjernagel's line leader and supervisor were reporting Tjernagel's leaving the line was causing the line to run short and disrupting production.

On October 24, 2005, Tjernagel was informed she needed a work capacity report (WCR) from her doctor. Tjernagel's physician, Dr. Bruce L. Hughes (Dr. Hughes), completed the WCR which was signed, dated, and returned to Gates on November 2, 2005. The WCR identified Tjernagel's condition as MS because Dr. Hughes was concerned Gates may not know what CIS was. The WCR listed several work restrictions including "[s]tanding restricted to less than 60% of shift" with "intermittent sitting vs. standing." The WCR noted Tjernagel's condition was "very intermittent" as signs and symptoms "can come and go" and advised "[Tjernagel] knows what she can tolerate and can determine when certain things are going to aggravate [her] disease. [Tjernagel] can do other work, sedentary work if possible. No overtime."

After receiving the WCR, Sorenson called Dr. Hughes's office and spoke to Dr. Hughes's nurse who reported Tjernagel's "restrictions are permanent and progressive. They are intermittent, sometimes no problems and then there will be problems. Hopefully, [Gates] can find something more suited to [Tjernagel's] needs. She wants to continue working."

On November 10, 2005, Sorenson met with Tjernagel asking, how will Gates get the WCR to work into Tjernagel's job description? Tjernagel replied, "With accommodations." Sorenson asked, "Like what?" and Tjernagel responded, "Like cameras on the crimpers and moving the guard machine closer." Tjernagel clarified she would like to be able to lower the camera (which Tjernagel had to look through to operate the machine) so she could operate the camera from a lower position. The machine had a mechanism that allowed it to be lowered. Tjernagel began to use this lowering mechanism every time and reported, "it worked better" for her. In addition,

the table where the guard material is placed on the hose was moved closer to the operator, reducing the operator's need to stretch her arms, although it still remained difficult for Tjernagel to perform the scrunching function as her carpal tunnel syndrome (which is not part of this claim) caused her pain. In this November 10, 2005, meeting between Tjernagel and Sorenson, Tjernagel believes she also said she "did not feel I [am] disabled."

Sorenson informed Tjernagel the plant worked overtime and Tjernagel could not be treated differently than other production workers. Tjernagel never worked overtime again and was never asked to do so. On January 17, 2006, Tjernagel was terminated because she could not work overtime and because of her other work restrictions. Tjernagel was informed of Gates's complaint and appeal procedure which included peer review and was told she had twenty-one days to seek peer review.

Between January 17 and 27, 2006, Tjernagel called the plant manager, Mark Cooper (Cooper), and asked if she could get her job back if her overtime restriction were lifted. Cooper advised her to check with her doctor, but did not say she would get her job back if the overtime restriction were lifted. Tjernagel contacted Dr. Hughes's office and asked to have the overtime restriction lifted. A new WCR, dated January 25, 2006, was submitted to Gates. The new WCR removed the overtime restriction, but was identical to the prior WCR in all other respects.

On January 26, 2006, Cooper and Sorenson met with Tjernagel. Cooper asked for and received a signed release from Tjernagel to allow the company's doctor to contact Dr. Hughes and allow Dr. Hughes to discuss Tjernagel's case, because Gates did not want to do anything contrary to Tjernagel's doctor's restrictions. The company doctor then attempted to contact Dr. Hughes, leaving a message on February 13, 2006, asking him to call regarding Tjernagel. Before Dr. Hughes returned the call, Tjernagel's attorney wrote Dr. Hughes on February 28, 2006, advising Dr. Hughes that the attorney understood a company physician was going to contact Dr. Hughes

regarding Tjernagel. Tjernagel's attorney opined it was "problematic" to have the company contact his client's doctors without the client being present, because the company could "ask very direct, pointed questions that have real legal implications without a physician understanding the legal implications related to the medical issue (i.e., defining essential functions of the job, discussing the nature and extent of the physical restrictions and health condition, etc.)." The attorney concluded, "If I can be of any assistance in that process, please let me know. . . ."

As a result of the attorney's letter, Dr. Hughes did not return calls from the Gates company doctor. When Cooper learned of this, he called Tjernagel and asked her to have Dr. Hughes return the company doctor's calls. On March 21, 2006, Gates advised Tjernagel by certified mail the company doctor had tried to reach Dr. Hughes to no avail, stating, "At this point, we will no longer pursue exchange of medical information via your expressed permission and will proceed with the final internal step." The letter also informed Tjernagel the twenty-one day deadline for submission of her written peer review appeal would begin on March 27, 2006. Tjernagel's attorney responded by sending a new letter to Dr. Hughes, via facsimile, stating, "it is fine for you to talk to the company doctor." In response, Dr. Hughes attempted to contact the company doctor. The company doctor returned Dr. Hughes's call the next day, but they never spoke.

On April 10, 2006, Dr. Hughes faxed Gates a work release form stating, "Patient may return without restrictions immediately." Under Dr. Hughes's standard office procedure this release indicated Tjernagel reported to his office she needed no accommodations or restrictions to perform the essential functions of her former job at Gates.

On April 18, 2006, Tjernagel submitted her peer review appeal letter, attaching her November 2, 2005, and January 25, 2006, WCRs. Tjernagel did not attach or mention the April 10, 2006, release stating she could return to work without

restrictions. The peer review panel, consisting of three hourly Gates production workers and two management members from the Versailles, Missouri, plant, unanimously upheld Tjernagel's termination. Gates informed Tjernagel of this decision on April 29, 2006.

Tjernagel can drive a car, care for her children, prepare meals, shop, run errands, vacuum, do laundry, engage in recreational activities, and even work in full time employment—as she started a new full-time job in late May 2006. In this new position, Tjernagel goes to homes where several mentally challenged individuals live. She drives herself to work at midnight, cleans restrooms and the kitchen, does charting and sits most of the night waiting for the residents to awaken. When applying for this position, Tjernagel did not mention anything about her medical or physical limitations or condition and did not request any accommodations.

Tjernagel filed her original complaint on July 28, 2006, and two amended complaints on August 3, 2006, and on November 21, 2006. Gates filed a motion for summary judgment, both sides submitted written arguments and responses, oral argument was heard, and the motion for summary judgment was granted on August 20, 2007, as to the discrimination claims. This appeal follows.

## II. DISCUSSION

We review de novo an order granting summary judgment. Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 910 (8th Cir. 2006). "In so doing, we view the facts in the light most favorable to the nonmoving party and we will affirm if the record indicates no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c)." Gretillat v. Care Initiatives, 481 F.3d 649, 652 (8th Cir. 2007) (citation omitted). This court "does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, "we focus on whether a genuine issue of material fact exists for trial

—an issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." Id. (citation omitted).

ADA and ICRA disability claims are analyzed under the same standards. See Nuzum v. Ozark Automotive Distribs., Inc., 432 F.3d 839, 842 n.2 (8th Cir. 2005). The ADA and ICRA prohibit "discrimination by a covered employer against a qualified individual with a disability because of the disability. An employer can discriminate by failing to make reasonable accommodation to the known limitations of an employee." Id. at 842 (citations and internal quotation marks omitted).

> An individual does not prove that he or she has a disability simply by showing an impairment that makes it impossible to do his or her particular job without accommodation. Rather, establishing "disability" is a significant hurdle that can prevent a person who was denied a job because of an impairment from being covered by the ADA.

Id. at 842-43 (citations omitted).

### A. Actually Disabled

Under the ADA and ICRA, a disability means an "individual must have (1) 'a physical or mental impairment' that (2) 'substantially limits one or more major life activities' of the individual." Id. at 843 (citing 42 U.S.C. § 12102(2)). Having a physical or mental impairment is not enough because the impairment must also comprise a substantial limitation of a major life activity. See id.

The district court concluded Tjernagel was not substantially limited in a major life activity and therefore was not disabled. Tjernagel asserts she is substantially

limited in the major life activities of lifting, standing, thinking,[4] walking, breathing and seeing.

In Tjernagel's November 10, 2005, meeting with Sorenson, Tjernagel stated she did not then feel she was disabled, although Tjernagel requested some accommodations. By April 10, 2006, Tjernagel reported to Dr. Hughes she needed no accommodations and no restrictions on her work performed at Gates. Tjernagel attempts to dismiss this report as irrelevant because it occurred after her January 17, 2006, termination. Yet, Tjernagel presents no evidence to explain the sudden improvement in her condition in the period of less than three months after Tjernagel's termination, but before the April report. With no evidence to explain a sudden change in condition, the district court could conclude the earlier restrictions were either overstated or in error. As such, the district court properly determined Tjernagel did not have a substantial limitation of any major life activity.

### B.    Regarded as Disabled

Tjernagel also asserts that, whether or not she was disabled, Gates regarded her as disabled. The district court did not discuss the "regarded as" claim. "In order to be regarded as disabled . . . the employer must mistakenly believe that the actual impairment substantially limits the employee's ability to work." Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 989 (8th Cir. 2007) (internal citations omitted). "A substantial limitation is present only when the employee is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.'" Id. (quoting Conant v. City of Hibbing, 271 F.3d 782, 784-85 (8th Cir. 2001) (per curiam)). "If an employer believes that an employee is unable to perform 'one specific

---

[4]Tjernagel asserts a limitation in her ability to think for the first time on appeal. Her doctor never listed any limitations related to her ability to think in his work restrictions, though Tjernagel did mention in her deposition short term memory was an issue, meaning she might forget what she was saying in a conversation, but it usually came back to her.

job,' then the employee is not regarded as disabled." Id. (citation omitted). Tjernagel asserts (1) Cooper believed she should not be on the production floor because of her CIS and associated restrictions; and (2) this belief is sufficient for Tjernagel to be "regarded as disabled." In fact, Cooper's testimony was in relation to trying to get the company doctor and Dr. Hughes to communicate because Cooper did not want "any danger to [Tjernagel] going forward," where Dr. Hughes's earlier report had termed Tjernagel's condition permanent and progressive, expressing Dr. Hughes's opinion Tjernagel "really doesn't need to be out on the production floor." Cooper obviously was seeking clarification, not making any assumption Tjernagel was substantially limited in the ability to work in a broad range of jobs in a variety of classes.

Even if we determined Gates regarded Tjernagel as disabled, summary judgment was still proper because Tjernagel was unable to perform the essential functions of her job. Based upon Dr. Hughes's report, Tjernagel's work restrictions were she could not work overtime, she needed to be allowed to self-monitor to make her own determinations when a task would aggravate her condition, and she should self assign herself to different tasks and areas without advance notice whether or not she was needed at the area where she chose to go. In addition, Tjernagel should alternate intermittently between sitting and standing. These restrictions are not compatible with the essential functions of Tjernagel's job.

Tjernagel's job description states, "[o]vertime is required to meet production demands and can include Saturdays and Sundays when necessary." It is undisputed that, in 2005, Boone employees worked twenty-two Saturdays. An employer's mandatory overtime requirement has been recognized as an essential job function. See Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305-06 (11th Cir. 2000) (concluding "overtime work . . . is akin to job presence, which has been held to be an essential function of a job." (citations omitted)). "Attendance at work is a necessary job function." Epps v. City of Pine Lawn, 353 F.3d 588, 593 n.5 (8th Cir. 2003) (citing Nesser v. Trans World Airlines, 160 F.3d 442, 445 (8th Cir. 1998)). "An employee

-10-

who cannot meet the attendance requirements . . . cannot be considered a 'qualified' individual protected by the ADA." Davis, 205 F.3d at 1306 (quoting Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 213 (4th Cir. 1994) (citations omitted)). When Tjernagel's restriction barred overtime, she was unable to perform an essential requirement of her job, being in attendance at work when needed, thereby rendering her unqualified for ADA protection.

Not only did Tjernagel's job require overtime, but so did all other production positions at Gates, a fact which is not disputed by Tjernagel. Tjernagel could not be reasonably accommodated by moving her to a different production position without an overtime requirement because no such production positions existed. Tjernagel, "must show that a reasonable accommodation was available," Epps, 353 F.3d at 593 n.5, but Tjernagel fails to show a reasonable accommodation existed because all of Gates's production jobs required overtime. See id. Thus, Tjernagel's inability to work overtime, a requirement of all of Gates's production positions, renders Tjernagel unqualified not only for her production job, but also for all other production jobs.

## VI.   CONCLUSION

Because Tjernagel is not disabled as defined by the ADA and ICRA, or regarded as disabled by Gates, the district court correctly granted summary judgment for Gates. We affirm.

_____