# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3159

_____

Michelle Siebrecht

*Plaintiff - Appellant*

v.

Mercy Health Services - Iowa Corp., doing business as MercyOne Siouxland
Medical Center

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Northern District of Iowa - Western

_____

Submitted: September 16, 2025
Filed: January 5, 2026

_____

Before SMITH, ARNOLD, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Michelle Siebrecht sued her former employer, Mercy Health Services Iowa Corp. d/b/a MercyOne Siouxland Medical Center (Mercy), alleging violations of the Americans with Disabilities Act (ADA), the Iowa Civil Rights Act (ICRA), and the Family and Medical Leave Act (FMLA). She claims that Mercy discriminated against her because of her disability and for taking FMLA leave. Mercy denies these

allegations. The district court[1] granted summary judgment for Mercy on all claims. Siebrecht appeals. For the reasons discussed below, we affirm.

## I. *Background*
### A. *Mercy's Hawarden Facility*

Siebrecht worked as a physician assistant for Mercy in the emergency room (ER) at Mercy's facility in Hawarden, Iowa. Because the Hawarden facility was a critical access facility, the ER was required to be staffed with at least one provider[2] at all times—24 hours per day, 365 days per year. ER providers are not plentiful in rural Iowa.

During the relevant time, Mercy usually staffed the Hawarden ER with four providers, including Siebrecht. Mercy referred to these providers collectively as advanced practice providers (APPs). APPs worked under employment contracts with initial terms. The contracts provided that at the end of the initial term, the hospital and the providers could extend the contract by written agreement. Otherwise, the contracts would continue month-to-month for up to 90 days. This 90-day period was known as the Temporary Renewal Period (TRP). If no extension agreement was reached during that period, the contract terminated after either 30 days' written notice or at the end of the TRP.

APPs worked 72 hours per two-week pay period. They did not have assigned shifts. Instead, a shift coordinator would circulate a calendar to APPs a month in advance, and they would respond by indicating their preferred shifts for that month. Pursuant to their contracts, APPs were required to work three 24-hour shifts per pay period. The contracts also stated that APPs were required to work weekends. When

---

[1]The Honorable Kelly K.E. Mahoney, United States Chief Magistrate Judge for the Northern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

[2]"Provider" refers to doctors, nurse practitioners, and physician assistants.

-2-

a shift could not be covered by an APP, workers known as PRNs and locums (temporary replacements) covered them.

## B. *Siebrecht's First FMLA Leave*

Siebrecht was diagnosed with multiple sclerosis (MS).[3] Due to effects of her condition, she took FMLA leave from June 3, 2021, to August 1, 2021. When her doctor filled out the paperwork for her leave, he indicated that ongoing stress at work and at home exacerbated Siebrecht's MS. He also stated that Siebrecht's episodic MS flareups could periodically prevent her from performing her job functions.

## C. *Mercy's Attempt to Renew Siebrecht's Contract*

Siebrecht's employment contract was set to expire on February 28, 2022. On January 25, 2022, the CEO at the Hawarden facility presented Siebrecht with a proposed contract extension. Siebrecht declined the offer and never made a counteroffer. Neither party ever raised the issue of negotiating a new contract with the other.

## D. *Siebrecht's Second FMLA Leave*

Siebrecht took her second FMLA leave from January 31, 2022, to March 14, 2022. Her FMLA paperwork stated that the leave was due to chronic MS with acute exacerbation. Siebrecht's doctor again attributed exacerbation to her strenuous work schedule and continued stress at home.

## E. *Siebrecht Seeks Accommodations*

On February 25, 2022, while still on leave, Siebrecht attended a doctor's appointment. After evaluating Siebrecht, her doctor cleared her to return to work by the middle of March with the following limitations: no more than one 24-hour shift per week and no weekend shifts because, according to him, weekend shifts in the

---

[3]In denying Siebrecht's partial motion for summary judgment, the district court concluded that "[a] fact question exists as to whether Siebrecht in fact has MS, and if so, whether it qualified as a disability under the law (whether it substantially limited a major life activity)." R. Doc. 112, at 15.

ER tend to be more hectic. In his treatment notes, the doctor opined that 24-hour shifts seemed to be an extremely long time for someone with her condition. He scheduled a three-month follow-up appointment with Siebrecht. He also suggested that if she continued to do well, he would permit her to work additional days. However, he also noted that her condition would have flareups for the rest of her life.

Siebrecht's doctor informed Mercy that her restrictions were expected to last through December 31, 2022. On March 16, 2022, the HR specialist stated that Mercy could accommodate Siebrecht's restrictions but could not confirm that the accommodation could be made through December 31, 2022.

## F. *Termination of Siebrecht's Employment*

The CEO of the Hawarden facility emailed an executive at Mercy, stating: "[Siebrecht] is now saying that her doctor notes states that she will be doing 1 (24) [hour] shift through December. This is not working out the best and I think we need to terminate her and let her disability run out. Or she can work at MercyOne her 24 [hour] shift." App. Vol. II, at 793. In his deposition, the CEO explained that he was expressing concern that Siebrecht was unable to meet her required shifts and that it was unfair to others in the department. Moreover, at least one of Siebrecht's colleagues complained to the CEO that Siebrecht's medical leave was unfair to other APPs.

Mercy decided to terminate Siebrecht's employment on April 26, 2022. Mercy notified Siebrecht of its decision via written letter dated April 28, 2022. The letter stated that because the parties had not renewed Siebrecht's employment contract, her employment with Mercy was terminated effective May 30, 2022, the day after her TRP would end. On May 20, 2022, Mercy communicated to Siebrecht that she was relieved of further shifts but would continue to be paid through May 30. Siebrecht never had any formal disciplinary actions during her employment with Mercy.

-4-

During a doctor's appointment on May 26, 2022, Siebrecht's doctor noted that her MS appeared stable. He signed a "Release to Return to Work" statement that released her to return to work with no restrictions effective June 13, 2022.

## G. *Litigation*

Siebrecht filed a lawsuit against Mercy in Iowa state court alleging violations of the ADA, the ICRA, and the FMLA. Mercy removed the case to federal court based on federal question jurisdiction. The district court granted summary judgment in favor of Mercy on all of Siebrecht's claims.[4] Siebrecht appeals.

## II. *Discussion*

Siebrecht argues that the district court erred by granting summary judgment on her disability discrimination claims and her FMLA claim. "We review the district court's grant of summary judgment de novo." *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If there is a genuine dispute of material fact, we view the disputed facts in the light most favorable to the nonmovant. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## A. *Disability Discrimination*

Siebrecht alleges that Mercy discriminated against her in violation of the ADA and ICRA. The district court granted summary judgment for Mercy on both claims after concluding that Siebrecht was not a "qualified individual." Siebrecht argues that the district court erred. We disagree.

---

[4]The district court's order also denied as moot Siebrecht's motions to supplement the record (R. Docs. 79, 94), denied Siebrecht's motion for partial summary judgment (R. Doc. 43), and denied as moot Mercy's motion for sanctions (R. Doc. 37).

"ADA and ICRA disability claims are analyzed under the same standards." *Tjernagel v. Gates Corp.*, 533 F.3d 666, 671 (8th Cir. 2008). Both statutes prohibit an employer from discriminating against a "qualified individual" based on the individual's disability. 42 U.S.C. § 12112(a); *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 22 (Iowa 2021) (explaining that only "qualified individuals" can establish a claim under the ICRA). To be a qualified individual, "an employee must (1) possess the requisite skill, education, experience, and training for her position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) (citation modified); *see also* 42 U.S.C. § 12111(8). An employee bears the burden of proving that she is a "qualified individual." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

It is undisputed that Siebrecht possesses the requisite skill, education, experience, and training for her position. At issue is whether she was able to perform the essential functions of her job with or without reasonable accommodation. We conclude that, on this record, the district court correctly concluded that she has not shown that she could perform the essential functions of her job.

### 1. *Essential Job Functions*

"An employer has the burden of showing a particular job function is an essential function of the job." *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007). Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007) (quoting *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir. 1998)). When determining what constitutes an essential job function, we consider evidence such as:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the

incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*McNeil v. Union Pac. R.R. Co.*, 936 F.3d 786, 789–90 (8th Cir. 2019).

The district court concluded that Mercy met its burden of showing that the ability to work three 24-hour shifts per pay period and weekend shifts was an essential function of Siebrecht's job. Siebrecht contends that the district court erred. She contends that the essential function of her job was to treat patients, not to work specific shifts. She argues that if the ability to work 24-hour shifts and weekend shifts was an essential job function, Mercy would have referenced her inability to work those shifts as a reason in her termination letter.

Applying the factors discussed above, we conclude that Mercy has met its burden of establishing that the ability to work three 24-hour shifts per pay period and weekend shifts constituted an essential function of Siebrecht's job. Mercy considers working three 24-hour shifts per pay period and weekend shifts essential functions of an APP. Mercy included both requirements in Siebrecht's, and every other APP's, employment contract. The contracts stated that "Provider's schedule shall include event and weekend coverage" and "Provider will be expected to work three (3) twenty four (24) hour shifts per pay period." R. Doc. 70-3, at 74. Moreover, the APPs schedules were comprised mostly of 24-hour shifts. Finally, if Siebrecht was not required to work her three 24-hour shifts per pay period or weekend shifts, other APPs, PRNs, or locums would have to cover for her by working additional shifts.

Siebrecht's argument that the essential function of her job was patient care misses the point. Patient care is certainly the ultimate purpose of the work that Siebrecht performed, as would be the case for most positions in a hospital. The focus of the inquiry is not on the ultimate purpose of services that Siebrecht performed but on the specific tasks required to complete the purpose of the particular position that she occupied. As we have explained, "the term essential function encompasses more

-7-

than core job requirements; indeed, it also may include scheduling flexibility." *Rehrs*, 486 F.3d at 358. Further, we have explained that requiring employees to work certain undesirable shifts—here, weekends—can be considered essential job functions because it enhances the non-work life of employees by spreading the shifts among them. *See Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 931 (8th Cir. 2012) ("Shift rotation also enhances the non-work life of Resource Coordinators by spreading the less desirable shifts—nights and weekends—among all Resource Coordinators.").

Accordingly, there is no genuine dispute of material fact as to whether working three 24-hour shifts per pay period and weekend shifts were essential functions of Siebrecht's position at Mercy. We affirm the conclusion that they were.

### 2. *Siebrecht's Ability to Perform Essential Job Functions*

Next, we address whether Siebrecht could perform these essential job functions related to her shifts with or without reasonable accommodation. It is undisputed that at the time Mercy terminated Siebrecht's employment, she could not work three 24-hour shifts and weekend shifts without reasonable accommodation. Thus, we must determine whether she could have worked the shifts with reasonable accommodation.

"Under the ADA . . . an employer must reasonably accommodate an employee's disability and engage in an interactive process to identify potential accommodations that could overcome her limitations." *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003). The employee has the "burden to make a facial showing that a reasonable accommodation would enable her to perform her essential job functions." *Scruggs v. Pulaski Cnty.*, 817 F.3d 1087, 1093 (8th Cir. 2016) (citation modified). An employee only needs to show that accommodation is reasonable on its face. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). If the employee meets her burden of showing that a reasonable accommodation is possible, "the burden of production then shifts to the employer to show that it had a legitimate

nondiscriminatory reason not to provide the accommodation." *Burchett*, 340 F.3d at 517.

### a. *Reduced Work Schedule*

Siebrecht argues that a reduced work schedule, with fewer 24-hour shifts and no weekend shifts, constituted a reasonable accommodation that would have enabled her to perform the essential functions of her job. However, as discussed above, the ability to work three 24-hour shifts per pay period and weekend shifts were essential job functions. Thus, the inability to work those shifts prevents performance of those essential functions. As the district court explained, "both the ability to work *all* of her shifts (*and not just two-thirds of them*) and the ability to cover weekend shifts both constitute essential functions of Siebrecht's job." R. Doc. 112, at 21 (emphasis added). There is no genuine dispute of material fact about whether a reduced work schedule would have enabled Siebrecht to perform the essential functions of her job.

### b. *Reassignment*

Siebrecht also argues that reassignment to a new position would have been a reasonable accommodation that would have enabled her to perform the essential functions of her job. "While reassignment to a vacant position can be a reasonable accommodation under the ADA, it is not necessarily required." *Burchett*, 940 F.3d at 517. "[R]eassignment to another position is a required accommodation only if there is a vacant position for which the employee is otherwise qualified." *Ehlers v. Univ. of Minn.*, 34 F.4th 655, 660 (8th Cir. 2022) (quoting *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 814 (8th Cir. 2005)). To establish reassignment as a possible accommodation, an employee "must make a facial showing that a position is available for which [she] qualifies." *Id.* An employee can establish that she qualifies for an available position by "mak[ing] a facial showing that she satisfied the legitimate prerequisites for an alternative position and would 'be able to perform the essential functions of that position with or without reasonable

accommodations.'" *Id.* (quoting *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1019 (8th Cir. 2000)).

Here, Siebrecht has not met her burden of establishing that reassignment to a new position was a reasonable accommodation. She has not identified an alternative position that was vacant during the relevant period. Nor can Siebrecht satisfy her burden by relying on the Hawarden facility's CEO's email to another executive that "she can work at MercyOne her 24 [hour] shift." App. Vol. II, at 793. This email does not identify an available position that Siebrecht was qualified for. Further, the CEO was the CEO of the Hawarden facility, not MercyOne, so his statement does not mean that there was an available position at MercyOne. The absence of an available position forecloses reassignment to an alternative position. There is no genuine dispute of material fact about whether reassignment would have been a reasonable accommodation.

c. *Interactive Process*

Lastly, Siebrecht argues that Mercy failed to engage in the interactive process. "[A] plaintiff can survive summary judgment on a reasonable-accommodation claim by showing that the employer failed to engage in an interactive process." *Ehlers*, 34 F.4th at 660.

> To establish that an employer failed to participate in an interactive process, a disabled employee must show: (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the employer did not make a good[-]faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Id.* (quoting *Cravens*, 214 F.3d at 1021). Ultimately, "[t]he employee still carries the burden of showing that a particular accommodation rejected by the employer would

have made the employee qualified to perform the essential functions of the job." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 954 (8th Cir. 1999).

Here, Siebrecht satisfies the first two elements. Mercy knew about Siebrecht's asserted disability and Siebrecht's requested accommodation. However, Siebrecht fails the fourth element. Even assuming Mercy failed to make a good-faith effort to assist Siebrecht in seeking accommodation, Siebrecht has not met her burden of showing that she could have been reasonably accommodated but for Mercy's lack of good-faith effort. As discussed above, Siebrecht has failed to identify any reasonable accommodation that would have enabled her to perform the essential functions of her job. Thus, Mercy's actions with respect to the interactive process yield no genuine dispute of material fact.

## B. *FMLA Claim*

Siebrecht also alleges that Mercy retaliated against her for taking FMLA leave, in violation of the FMLA. The district court granted Mercy's motion for summary judgment on this claim after concluding that there was no causal connection between Siebrecht's FMLA leave and Mercy's termination of her employment. Siebrecht argues that the district court erred. We disagree.

The FMLA prohibits employers from discriminating against employees for exercising their rights under the Act. *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). This "includes consideration of an employee's use of FMLA leave as a negative factor in an employment action." *Id.* But "[t]aking FMLA leave . . . does not give an employee any greater protection against termination for reasons unrelated to the FMLA than was available before." *Malloy v. U.S. Postal Serv.*, 756 F.3d 1088, 1090 (8th Cir. 2014).

When an employee's FMLA retaliation claim is not based on direct evidence, we analyze the claim under the *McDonnell Douglas* burden-shifting framework.[5]

---

[5]*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

*Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008). Under this framework, the employee has the initial burden to establish a prima facie FMLA retaliation claim. *Id.* To do so, she must present sufficient facts for a jury to find that (1) "she engaged in activity protected under the Act," (2) "she suffered an adverse employment action by the employer," and (3) "a causal connection existed between the employee's action and the adverse employment action." *Darby*, 287 F.3d at 679. If the employee is successful, the burden shifts to the employer to present evidence of a legitimate, nondiscriminatory reason for the adverse action. *Phillips*, 547 F.3d at 912. Finally, if the employer satisfies its burden, the employee must present evidence that creates an issue of fact as to whether the employer's reason was pretext for discrimination. *Id.*

Because Siebrecht's FMLA retaliation claim is not based on direct evidence, we analyze the claim under the *McDonnell Douglas* framework.

### 1. *Prima Facie Retaliation Claim*

First, did Siebrecht meet her burden of establishing a prima facie FMLA retaliation claim? The first two elements are not at issue. It is undisputed that Siebrecht engaged in protected activity when she took FMLA leave and that she suffered an adverse employment action when Mercy terminated her employment. At issue is whether a causal connection existed between the protected activity and adverse employment action, i.e., whether Mercy terminated Siebrecht's employment *because* she took FMLA leave.

The only evidence Siebrecht relies on to support the causation element of her claim is the following deposition testimony from the CEO of the Hawarden facility:

> Q: Why did you tell Ms. Pingel that you believed [Siebrecht] should be terminated?
>
> A: Because of her unreliability.

. . .

Q: Well, when you said that Ms. Pingel asked you if Ms. Siebrecht should be terminated and you said yes, and the reason was because of her unreliability and the fact that she could only work 24 hours a shift, what were you referencing when you were talking about only working 24 hours a shift?

A: Well, that was the restriction. I mean, I—that was the restriction of her 24-hour shifts, and that was an accommodation we tried to make work out, but it just didn't work out.

Q: Okay. So you're talking about a restriction that [Siebrecht] had when she came back to work following her FMLA leave in 2022?

A: Again, I'm looking at blocks of—blocks of situations. [Siebrecht] went out on some time related to FMLA. She then came back, which I believe she had no restrictions of what I can recollect. And then she went out for another period of time with restrictions when she came back.

R. Doc. 70-3, at 194, 106:12–15, 108:20–109:13.

Siebrecht contends that when the CEO testified that he believed Siebrecht's employment should be terminated because of her "unreliability," he was referring to the "blocks of situations" he referenced in response to a subsequent question. Siebrecht argues that the "blocks of situations" were the two times that she took FMLA leave. Thus, according to Siebrecht, the CEO believed that Siebrecht was unreliable because she took FMLA leave twice. Siebrecht asserts that this testimony, viewed in the light most favorable to her, is sufficient to create a genuine issue of material fact as to the causation element of the prima facie retaliation claim.

Siebrecht's argument, however, unreasonably construes the CEO's testimony. The CEO's reference to "blocks of situations" made no statement that her FMLA use played a role in her termination. It was the medical restrictions following the FMLA leave that prevented her from fulfilling the job requirement of 24-hour shifts.

-13-

The CEO's testimony made clear that when he said Siebrecht was unreliable, he was only referring to her restriction on 24-hour shifts:

> Q: Okay. So let's finish up the conversation in which Ms. Pingel asked you should [Siebrecht] be terminated, you said yes, she's unreliable. We have the 24-hour shift restriction, we can't meet that, it's unfair, causes a burden on others in the department. Am I accurately summarizing what you're relaying to her?
>
> A: Yeah.
>
> Q: Did you relay any other reasons why you felt Ms. Siebrecht should be terminated in that same conversation with Ms. Pingel?
>
> A: Not that I recall.

R. Doc. 70-3, at 196, 122:7–17. The CEO did not reference FMLA leave in connection with Siebrecht's unreliability. Considering the CEO's testimony in the context of his entire deposition makes clear that his comments about Siebrecht's unreliability were unrelated to his comments about "blocks of situations."

### 2. *Pretext*

Even if we were to find that Siebrecht established a prima facie FMLA retaliation claim, she did not carry her burden to show that Mercy's reason for terminating her employment was pretext for discrimination. The district court concluded that Siebrecht's inability to perform the essential functions of her job with her restricted schedule constituted a legitimate, nondiscriminatory reason for Mercy to terminate her employment. Siebrecht argues that this reason was pretextual.

Pretext may be demonstrated in two ways. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). The first way is to show "that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)). "Under this method, the employee must rebut the employer's 'underlying factual claims' by establishing that

the employer's explanation has no basis in fact." *Id.* (quoting *Wallace*, 442 F.3d at 1120). The second way is to prove pretext directly by persuading the court that an employer's action was more likely motivated by a prohibited reason. *Id.* "Pretext may be shown with evidence that the employer's reason for the termination has changed substantially over time." *Loeb v. Best Buy Co.*, 537 F.3d 867, 873 (8th Cir. 2008).

Siebrecht argues that Mercy used her inability to perform the essential functions of her job as a pretext for terminating her employment. She asserts that Mercy previously gave a different reason for terminating her employment, namely, the expiration of her employment contract. However, providing more than one reason for terminating an employee's employment contract is insufficient to establish pretext. *See id.* at 874 (noting that some of the reasons the employer gave for terminating plaintiff's employment were, in fact, consistent). Having multiple reasons for termination may be indicative of pretext particularly if the reasons are contradictory. Inability to perform work functions and contract lapsing are not necessarily conflicting reasons.

Mercy could have terminated Siebrecht's employment for her inability to perform the essential functions of her job and because her employment contract expired. "Unlike the ADA, the FMLA does not mandate that employers reinstate employees who are unable to perform the essential functions of their positions." *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 864 (8th Cir. 2006). "[T]he FMLA omits any requirement that employers seek to reasonably accommodate employees who cannot perform the essential functions of their respective positions." *Id.* at 864–65. Thus, under the FMLA, Mercy could terminate her employment for her inability to perform the essential functions of her job.

Further, Siebrecht's employment contract expressly stated that if the parties did not agree to extend the contract, it would terminate after either 30 days' written notice or at the end of the TRP. Here, the parties did not extend Siebrecht's contract,

so Mercy gave her 30 days' written notice that her contract would be terminated at the end of the TRP.

Siebrecht argues that Mercy's decision to terminate her employment after her TRP expired created an inference of pretext because Mercy did not terminate another APP's employment after their TRP expired. However, "[t]he burden is on the plaintiff to prove [she] was similarly situated in all relevant respects to a more favorably treated employee." *Ricks v. Riverwood Int'l Corp.*, 38 F.3d 1016, 1019 (8th Cir. 1994). Further, "the employees used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1126 (8th Cir. 2017) (citation modified).

Here, Siebrecht has not met her burden of establishing that the other APP who signed a new contract after their TRP expired was similarly situated to her in all relevant respects. Notably, Siebrecht has not established that the other APP made no counteroffer to Mercy's proposed contract extension or allowed her TRP to expire. On the contrary, it appears that the other APP verbally accepted Mercy's proposed contract extension before their TRP expired. These are distinguishing circumstances that make the other APP an inapposite comparator.

Siebrecht has not met her burden to present evidence that creates a genuine issue of material fact as to whether Mercy's reason for terminating her employment was pretext for discrimination.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____